Filed 6/17/14  P. v. Najera CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G047055 |
| v. | (Super. Ct. No. 09HF0293) |
| ELISEO DIAZ NAJERA, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Gregg L. Prickett, Judge.  Reversed.

Kristin A. Erickson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, William M. Wood and Marvin E. Mizell, Deputy Attorneys General, for Plaintiff and Respondent.

\*          \*          \*

A jury convicted defendant Eliseo Diaz Najera of sodomizing a child age 10 years or younger. (Pen. Code, § 288.7, subd. (a).) The jury also found true the allegation that defendant had substantial sexual conduct with the victim during the commission of the sodomy. (Pen. Code, § 1203.066, subd. (a)(8).) The court sentenced defendant to 25 years to life in prison.

On appeal defendant contends the court's sidebar procedure, in which it discussed many evidentiary objections without a court reporter present, violated his right to a public trial. He further claims the court restricted his counsel's cross-examination of three witnesses so severely that it infringed on his rights to present a defense and to confront and cross-examine the witnesses against him. Finally, he asserts the alleged errors were cumulatively prejudicial.

The last two contentions have merit. The court abused its discretion by improperly excluding evidence relevant to the victim's credibility. Cumulatively, the erroneous evidentiary rulings infringed on defendant's constitutional rights and were not harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18.)

FACTS

The victim, E., is defendant's son. When E. was eight or nine years old and in the third grade, he lived with his mother M. (mother), his big sister J. (sister), and defendant in one bedroom in another family's home. Defendant, mother, and sister would sleep together on one sofa bed, while E. slept on the floor.

*Initial Report to Law Enforcement and Subsequent Interviews*

When E. was in the fifth grade, defendant lost his job and mother was not really working. E. did not want to return to Mexico to live with his other siblings. One

2

day E. got into trouble at school.  The school asked mother to come to the school because E. was misbehaving.

E. was brought to the principal's office.  The principal asked E. if anything was going on at home that was different or was upsetting him, because  E. had not "been himself."  E. told the principal that defendant had sodomized him when he was in the third grade.  The principal immediately stopped the conversation and called law enforcement.  An officer and a social worker arrived.

The social worker, who was assigned to the Child Abuse Services Team (C.A.S.T.), spoke with E. and used a gingerbread boy drawing to talk about body parts.  Although the social worker could not remember much, she did recall that E. "was very shy and he didn't want to provide a lot of information."  When asked if anyone had touched his body parts, E. said yes, but did not want to say who it was.  The social worker asked if the person lived in the home and was related to E.  Finally E. said, "Well, my dad was drunk, and he touched me."  E. said that when he was eight or nine years old, defendant touched him on his chest, stomach, buttocks, and legs, and grabbed and pulled E's "private" hard.  Defendant put his private in E.'s anus.  E. said he was afraid that his dad would do this again.  While E. was saying what his father did, he looked sad.

An investigator in the sheriff's sexual assault crimes unit, along with the social worker, interviewed mother at the school.  The interview was recorded.  When mother was asked what happened when defendant touched E., initially she said she did not see anything and E. did not tell her anything.  Mother then said that about two years before, she had awoken from her sleep in the bedroom because she heard a sound like "something was pulling, pulling."  She asked E. what happened.  E. said defendant put his finger inside E.'s "butt."  Mother checked E. and did not see anything.  Mother believed E. was telling the truth.  The next day Mother asked defendant, "What did you do to the boy?"  Defendant said, "Nothing."  Mother said, "I am not going to forgive you for this thing."  Defendant said that "supposedly he did it" and he would not do it again.

3

The investigator drove mother home and interviewed defendant there.  The interview was recorded.  Defendant said that about a year or a year and a half earlier, he was very drunk and "made a mistake."  Defendant said he touched E.'s penis.  Defendant said he told mother he made a mistake and that it would not happen again.  Defendant denied putting his penis or his finger inside of E.'s "butt."  Defendant saw it was E's body, so he "held back."  He now avoids drinking for that reason.   The investigator arrested defendant.

The next day, a C.A.S.T. social worker interviewed E.  The interview was recorded.  E. said one night when he was in third grade and eight or nine years old, his dad was drunk, his mom was sleeping in the bed and E. was sleeping on the ground, and his dad put his blanket on top of him and moved over to E. and grabbed him.  His dad touched E.'s "pompas" and "pipe," the private parts in front and back, inside of E.'s clothes.  Defendant lowered E.'s underwear,  took out his front "privacy" or "pipe," and "put it inside" E.'s back "pompas."  It hurt and E. cried.  Mother woke up and asked defendant why he was doing that and to go sleep outside if he was going to do that.  In the morning mother asked what happened and E. told her everything.  She sent him to buy food.  When E. came back, she and defendant acted normal, like there was no trouble.  Mother did nothing, other than to tell E. to let her know if defendant ever did it again.  Defendant said nothing to E. about it.  That was the first time defendant had ever done it.  E. was afraid of his dad because he feared defendant would do it again.  E. did not see defendant's "pipe" because of how they were positioned.  E. felt defendant's arms around him at the same time he felt the "pipe" in his "pompas."

E. was moved into the home of a foster mom, Diane.


*Trial Testimony*

At trial, E. was 14 years old and in the eighth grade.  He testified to the following additional facts beyond those recited above.  During the incident when

4

defendant touched him, E. was on the floor lying on his side. Defendant was lying on his side behind E. and had his hands on the sides of E.'s waist. E. smelled alcohol on defendant. Defendant pulled E.'s pajama bottoms and underwear down to his knees. Defendant put his penis inside E.'s anus for a couple of seconds. It hurt. When defendant took his penis out of E.'s anus, E. started to cry. E. was scared. Defendant had never done this to E. before. They did not say anything to each other. The next morning, E. told mother that defendant had put his penis into E.'s anus. E. began sleeping near sister. Defendant never did this to E. again.

On cross-examination, defense counsel elicited the following information from E. At the time of trial, E. had lived with Diane for three and a half years. At Diane's house, E. had his own room with a bed, a radio, a TV, and video games. He received an allowance and had dogs. He would tell Diane "small" lies.

E. would lie to defendant about doing his homework. Defendant punished E. by hitting him with a belt. Without telling his parents, E. once went to the beach for half a day with a man who lived in a house where E.'s family was renting a room. E. got in trouble for it.

After E. moved in with Diane, he often visited mother. But after Diane talked with E. about adopting him, and after a social worker told E. the department was working toward having him live with mother again, E. stopped visiting with mother or even taking phone calls from her. Immediately after being told he might be returned to living with mother, E. told Diane that defendant had once punished him by putting E.'s hands over the flames on the stove. E. denied ever telling Diane or a social worker that mother brought letters from defendant on her visits with E.; E. denied ever receiving any letters from defendant through mother.

On redirect examination, E. testified he was not lying so he could stay with Diane nor was he lying because he enjoyed the life he had now. E. replied, "No," to the

5

prosecutor's question, "Did you ever think, wow, if I tell on my dad, maybe I can go live with some random person?"

Mother testified that when E. first talked to her about defendant touching him, E. said defendant put his finger up E.'s anus. Defendant was drunk, and mother heard a noise so she turned on the light and saw E., "who was laying there." Mother grabbed defendant by the hair and shook him. He said, "Please forgive me. I won't do it again." Mother grabbed E. and took him to the bathroom, pulled down his underwear, and checked him. She saw no blood or anything. She told E. that if defendant ever touched him again, E. should tell her.

Mother never asked E. about it again because E. seemed to be fine. Although E. was having trouble at school, he had already been "like that" — he liked hitting boys, he liked pulling girls' hair, and he liked taking water bottles away from other children. E. would lie to mother a lot. Once he went with a guy to the beach without asking mother for permission. The school would send reports of E.'s bad behavior home with him, but E. would not give the reports to defendant, and instead signed defendant's name. E. went out to play with other kids when he was supposed to take the bus home. This was the same type of behavior E. had exhibited in Mexico.

*Defense*

Diane testified E. had lived with her since April 2009. E. had lied to Diane about homework. When E. first came to live with Diane, he told her that when he was younger his hands had been burned by defendant. Diane did not see any burns on E.'s hands.

A social worker testified that she spoke with E. in September 2009. E. told the social worker that when mother visited E., mother would bring letters from defendant and have E. read them.

6

Sister testified E. is her younger brother. Sister grew up with E. in Mexico. Her father, defendant, never sexually touched her when she was growing up or when she lived with him, E. and mother in San Juan Capistrano. She never saw defendant act sexually inappropriate toward anyone. On cross-examination, sister testified she was seeing defendant every two weeks but had not seen E. for about two years.

DISCUSSION

*The Court Did Not Deprive Defendant of His Right to a Public Trial*

Defendant contends the 26 unreported conferences between the court and counsel violated his Sixth Amendment right to a public trial. He asserts that 21 sidebars and five chambers conferences were conducted in which major evidentiary issues were argued and decided.

The Attorney General counters that defendant forfeited his claim by failing to object below and that, in any case, his right to a public trial was not violated because the off-record conferences were not tantamount to excluding the public from the trial.

Although defendant failed to object below, we address his contention on the merits to avoid an ineffective assistance of counsel claim on petition for habeas corpus.

A criminal defendant has a constitutional right to "a trial which is open to the general public at all times." (*People v. Woodward* (1992) 4 Cal.4th 376, 382 (*Woodward*).) The public, too, has a right to an open trial. (*People v. Esquibel* (2008) 166 Cal.App.4th 539, 552 (*Esquibel*).) Openness "enhances both the basic fairness of the criminal trial and the appearance of fairness so essential to public confidence in the system." (*Press-Enterprise Co. v. Superior Court of Cal.* (1984) 464 U.S. 501, 508.) A public trial helps keep the court and the triers of fact "'keenly alive to a sense of their responsibility and to the importance of their functions'" and may also discourage witnesses from committing perjury. (*Woodward*, at p. 385.)

7

A violation of the right to a public trial is a structural error and is reversible per se. (*People v. Bui* (2010) 183 Cal.App.4th 675, 680.) But not every closure of a hearing or exclusion of some spectators violates the right to a public trial. For example, a hearing may be closed to spectators when the party seeking closure "advance[s] an overriding interest that is likely to be prejudiced, [but] the closure must be no broader than necessary to protect that interest, the trial court must consider reasonable alternatives to closing the proceeding, and it must make findings adequate to support the closure." (*Waller v. Georgia* (1984) 467 U.S. 39, 48.) Such an overriding interest, or "'higher value,' [might be a] defendant's right to a fair trial, or the government's interest in preserving the confidentiality of the proceedings." (*Woodward*, *supra*, 4 Cal.4th at p. 383.)

In addition, certain partial and temporary exclusions or closures are so de minimis or trivial that they do not violate a defendant's public trial right. In *Bui*, *supra*, 183 Cal.App.4th 675, the temporary exclusion of three individuals for about 40 minutes, "during only a small part of the voir dire of prospective jurors, and not during the evidentiary phase of the trial," was de minimis and did not violate the defendant's public trial right. (*Id*. at p. 688.) In *Woodward*, the temporary locking of the courtroom doors during the prosecutor's closing argument was de minimis because "the closure did not exclude preexisting spectators, did not include any of the evidentiary phase of the trial and lasted only one and one-half hours." (*Woodward*, *supra*, 4 Cal.4th at pp. 385-386.) In *People v. Buck* (1941) 46 Cal.App.2d 558, 562 (*Buck*), the temporary closing of the courtroom doors during the reading of jury instructions did not deprive the defendant of a public trial. In *Esquibel*, *supra*, 166 Cal.App.4th 539, the temporary exclusion of two Hispanic male spectators during the testimony of a juvenile witness did not violate the defendant's constitutional right because "the exclusion of the spectators was for a minimal amount of time and [the defendant's] family supporters remained in the courtroom." (*Id*. at p. 554.) The *Buck* and *Esquibel* decisions do not rest on the "de

8

minimis" rationale, but instead state that the term "public trial" has no single description, but instead "is used in a relative sense and its meaning depends largely upon the circumstances of each particular case." (*Esquibel*, at p. 552; *Buck*, at p. 562.)

Defendant contends the sidebar and chambers conferences that took place in this case cannot be considered de minimis because they were so numerous and addressed critical issues such as the admission of evidence to impeach E. Another significant distinction from the partial closure cases discussed above is that, here, the public was *totally* excluded from the private conferences, as was defendant, his interpreter, and the court reporter. The courtroom itself, however, was never closed nor was anyone excluded from the courtroom at any time during the proceedings.

More similar to these circumstances were those in *People v. Virgil* (2011) 51 Cal.4th 1210, 1234 (*Virgil*), where the trial court, during voir dire, conducted all cause challenges at sidebar. "[M]ore than three years after briefing [on appeal] had been completed, [the] defendant filed a supplemental brief raising the new argument that the questioning of jurors at sidebar violated his federal constitutional right to a public trial." (*Id.* at p. 1237.) The appellate court reviewed the record and held "that the brief bench conferences during jury selection . . . imposed no more than a de minimis infringement of the public trial guarantee. These brief episodes of questioning and argument at the bench did not deprive defendant of his right to a public trial." (*Id.* at p. 1238.)

It is troubling that so many sidebar conferences were conducted in this case, during the evidentiary part of the trial without a court reporter present and without later placing on the record the arguments made at sidebar.

Nonetheless, the sidebar and chambers conferences did not violate defendant's right to a public trial. "Not every sidebar conference rises to the level of a constitutional violation. Trial courts retain broad power to control their courtrooms to maintain security, protect the defendant's interest in a fair trial, protect the privacy concerns of prospective jurors, and efficiently dispose of matters outside the hearing of

9

jurors or testifying witnesses." (*Virgil*, *supra*, 51 Cal.4th at p. 1237.) "[B]oth the defendant's and the public's right [to a public trial] may be subjected to reasonable restrictions that are necessary or convenient to the orderly procedure of trial . . . ." (*Esquibel*, *supra,* 166 Cal.App.4th at p. 552.) "Defendant has directed us to no case that holds sidebar conferences to discuss sensitive or potentially prejudicial matters are akin to a closure of the courtroom, violating state or federal constitutional public trial guarantees." (*Virgil*, at p. 1238.) A trial is still "public" even if court and counsel hold nonpublic conferences on questions of law which could not have been properly heard in the jury's presence. (*People v. Teitelbaum* (1958) 163 Cal.App.2d 184, 206.)

Here, even though the conferences were off-record (unlike those in *Virgil*), the court's express rulings on the pertinent evidentiary objections were on the record (and any elaborations it made on those rulings off-record can be gleaned from counsel's ensuing questions of the witness on the record). The purpose of a public trial — that the trial be fair to both parties, with all participants properly and responsibly performing their duties — was met here, where counsel for both parties were present with the judge at all the off-record conferences. (*Esquibel*, *supra*, 166 Cal.App.4th at p. 554 [to hold that public trial right was violated "would not serve the purposes of the public trial right"].) It appears the conferences were brief and that the *results* of the sidebars on evidentiary objections were apparent on the record. The courtroom remained open to spectators. Under these circumstances, defendant was not deprived of his right to a fair, public trial.

*The Court Abused Its Discretion by Limiting Defendant's Ability to Cross-examine Witnesses*

1. *The court's evidentiary rulings.*

Defendant contends the court violated his constitutional rights to present a defense and to confront witnesses by limiting his ability to cross-examine E., his mother, and his foster mother Diane on the following issues relevant to E.'s credibility. Most of

the court's evidentiary rulings challenged by defendant are described in a settled statement certified by the trial court, since the court made all but one of the rulings at sidebar conferences without the court reporter present.

First, the court restricted defense counsel from cross-examining mother about specific lies told by E. in Mexico. According to the settled statement, "[d]efense counsel made an offer of proof at sidebar that there was extensive history of lying and stealing that his mother in Mexico observed. Defense counsel cited specific examples from [E's] mother and his adult siblings of [E.] lying about killing chickens and about stealing money. The court sustained the prosecution's relevance objection and denied the defense further questioning regarding [E.'s] conduct in Mexico."

Second, the court restricted defense counsel from cross-examining E. about whether he is Italian and whether he told his foster mother he was from Italy. According to the settled statement, "[t]he prosecution objected to both questions as irrelevant. The Court sustained the objections. Defense counsel gave an offer of proof that the dependency proceeding transcripts contained information that [E.] reported to his foster mother that he was Italian and that he could speak Italian. This action was relevant for the value of credibility of the witness and for bias to the extent to that [E.] denied being from Mexico and did not want to return to Mexico with his parents."

Third, after a sidebar conference, the court struck Diane's testimony that E. had told her he was from Italy. The court instructed the jury to disregard the answer. According to the settled statement, "[a]t sidebar the defense offer of proof was that [E.] went as far as to lie to the foster mother about not being from Mexico because he did not want to return to Mexico. The defense also offered that [E.] did not want to be returned to his mother's care out of fear that he would have to return to Mexico where he had lived in poverty compared to the foster mother's home. The court limited defense cross examination of [Diane] regarding whether [E.] lied to her by saying he was from Italy as opposed to Mexico. The court specifically limited the defense from questioning [E.]

11

about citizenship and the fact that as part of the adoption [E.] would become a United States citizen."

Fourth, the court restricted defense counsel from cross-examining E. about being in the process of adoption. According to the settled statement, "[t]he prosecution objected to the question as irrelevant. At sidebar the defense made an offer of proof that the foster mother was in the late stages of the adoption process and this was a critical issue regarding [E.'s] pattern for untruthfulness when he was about to be returned to his mother's care during the dependency proceedings. At sidebar, the Court agreed to allow cross-examination of [E.] and whether [E.] thought his testimony would affect the status of where he would live in the future. The defense was prohibited from inquiry regarding the adoption."

According to the settled statement, the court also restricted defense counsel from cross-examining E. about "being in trouble at school immediately prior to alleging he was molested by [his] father" and about whether E. "went to the beach with an adult male without the parent's permission and whether [the adult male] was inappropriate with" E. (Italics omitted.)

Finally, after Diane had finished testifying, defense counsel asked to further address issues that had arisen during Diane's testimony. The court conferred with counsel for both parties outside the jury's presence, but in the presence of defendant and the court reporter. Thus, this conference is contained in the reporter's transcript. Defense counsel made an offer of proof that Diane told the defense investigator that E. had told her many lies. The court stated the evidence of where E. claimed to be from had "huge" Evidence Code section 352 issues.[1] The court asked defense counsel why it was unreasonable to exclude, under section 352, the evidence that E. claimed to be from Italy, when the question would open the door to E. replying, "'Because I am here illegally,' 'I

---

[1] All statutory references are to the Evidence Code unless otherwise stated.

12

don't want people to know that,' [or] 'I'm embarrassed by that.'" Defense counsel argued it showed a pattern of lying and that E. had told the defense investigator as recently as a few months earlier that "[E.'s] from Italy, been to Italy, remembers being from Italy." Defense counsel also argued that Diane, in her trial testimony, had minimized what E. lies about, because in December 2011 (three months before trial), Diane had told the defense investigator that "while [E.] is still a good boy, he is sneaky and lies about things . . . to the extent . . . that she has thought about not adopting him." The court replied that there had been a prior lengthy sidebar discussion on that issue and that the court had ruled the evidence was inadmissible as inappropriate opinion evidence and on 352 grounds because the question "goes into way so many factors about 'What type of child are you looking to adopt,' 'What is your family situation like,' you know, all sorts of things that have nothing to do with the issues that this jury is being asked about. [¶] So you're trying to connect the dots that in a sense makes these lies so big that they affect the adoption. And the court has said, 'I'm going to stop you there and not allow you to go into the adoption. You can go into the lies but not into the adoption.'" The record, however, reveals the court did *not* allow defense counsel to go into the lies. When defense counsel asked E. what types of lies he would tell Diane, the court sustained the prosecutor's relevancy objection so that the question went unanswered.

2. *The court abused its discretion by excluding relevant evidence. The cumulative effect of those errors was to deny defendant his rights to present a defense and to confront and cross-examine witnesses.*

The jurors' belief that E. was a credible witness was crucial to their convicting defendant of sodomy. No physical evidence supported a finding that defendant's penis penetrated E.'s anus. There was no pattern of such behavior by defendant — E. testified it had never happened before and never happened again. Thus,

13

to find defendant guilty of sodomy, the jurors had to believe, beyond a reasonable doubt, that E. was credible. The defense theory was that E.'s testimony was *not* credible.

In her closing argument, defense counsel told the jurors, "I went any direction I could to talk about lying." What she did not tell them, yet what is evident from the record, is that the court blocked her efforts — time and again — to show that E. has told significant falsehoods in his young life and that he harbored a motive for lying and exaggerating about what defendant had done to him. As stated by defendant on appeal, the "court curtailed defense counsel's presentation of impeachment evidence severely so that [E.] presented as nothing more than a kid that occasionally told innocuous untruths."

As we shall explain, the court's rulings were wrong under California's rules of evidence and therefore the court abused its discretion. (*People v. Cooper* (1991) 53 Cal.3d 771, 816 [court's rulings on relevance of evidence, as well as under section 352, reviewed for abuse of discretion]; *In re Charlisse C.* (2008) 45 Cal.4th 145, 159 [disposition that rests on error of law is abuse of discretion].) As we shall further discuss, the cumulative effect of the errors infringed on defendant's constitutional rights to present a defense and to confront and cross-examine witnesses. Moreover, the errors were *not* harmless beyond a reasonable doubt. (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)

"'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action.'" (§ 210.) Character evidence is admissible concerning (1) the character of the *victim* of the crime offered to prove conduct in conformity with that character trait (§ 1103, subd. (a)(1)), and (2) a *witness's* character for honesty or bias (§ 780), including testimony from an individual who knows the witness or the witness's reputation for honesty (*People v. Sergill* (1982) 138 Cal.App.3d 34, 39).

14

Here, the excluded evidence was (1) relevant to E.'s credibility, (2) had a "tendency in reason to prove or disprove" whether defendant sodomized E. (the sole disputed fact that was "of consequence to the determination of the action"), and (3) was admissible character evidence concerning E., who was the victim and the chief prosecution witness.

But the Attorney General argues the excluded evidence was irrelevant. We discuss each of her arguments in turn.

First, the Attorney General argues that the evidence of E.'s lying about killing chickens and stealing money in Mexico was "not directly relevant to [E.'s] credibility . . . because it did not involve a prior false claim of molestation," and even if it did have "tangential relevance to his credibility because it involved lying, the trial court did not arbitrarily exclude the evidence as irrelevant in light of its pre-trial ruling to avoid any and all discussion of how E., and his family, had arrived in the United States from Mexico."

The argument is not persuasive. The question is not whether the court ruled *arbitrarily* in light of its pretrial ruling that it was "irrelevant how [E.] got" to the United States and that "immigration" evidence would be excluded to protect E. The only question is whether the court ruled *correctly* that the evidence was irrelevant, since that was the only ground on which the court excluded the evidence. The ruling was wrong. The evidence that E. told lies in Mexico about serious matters was relevant to his credibility.

Second, the Attorney General argues that the evidence of E.'s "lying about being from Italy was irrelevant because whether he would lie based on wanting to stay with [Diane] and/or was ashamed of being in the United States illegally from Mexico, had no relation whatsoever to whether he would lie about being sodomized by" defendant. Again, the argument is not persuasive. Regardless of E.'s motivation for lying about where he was from, his willingness to baldly lie to his foster mother (and the

15

defense investigator) was relevant to his credibility. That E. would insist he is from Italy and can speak Italian suggests that, in defendant's words, E. is a child who "can look authority figures in the eye and lie without reservation."

But the Attorney General argues the evidence would have been prejudicial under section 352 "because, as stated by the trial court, it could open the door to prejudicial evidence of how [E.] came to be in the United States." Her reliance on section 352 is misplaced. Presumably, the evidence would have shown that E. entered this country illegally. But against whom would the presumed prejudice operate? Evidence that E. came to the United States from Mexico was unlikely to evoke an emotional bias against E., especially because E. came to this country from Mexico with defendant as a little boy who had no control over that decision. If anything, any prejudice flowing from this information would have been directed against defendant for his presumed illegal entry into this country. And defendant thought it more important to suffer this potential prejudice by inquiring into E.'s credibility in the trial of his current offense, rather than to be overly concerned with his own potential violation of the immigration laws. "'"[E]vidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose."'" (*People v. Howard* (2010) 51 Cal.4th 15, 32.) Here, the prosecution likely would not have suffered prejudice by the admission of this evidence, and the evidence's probative value in support of the defense was high.

Next, the Attorney General argues that the "issue of whether [E.] was biased because he wanted to be adopted by [Diane], as opposed to [being returned to live with mother], was completely irrelevant based on the fact that when [E.] first complained of [defendant] sodomizing him to his principal, law enforcement, and during his C.A.S.T.

16

interview, he could not have known he would be removed from [mother's] care and adopted by [Diane]." The Attorney General argues E. had no motivation to lie about defendant sodomizing him when E. spoke to the school principal because E. could not have known he would end up living in a better situation as a result.

The argument is unpersuasive for two reasons. First, E.'s desire to be adopted by Diane and stay in the United States was relevant to whether his trial testimony was credible. That his trial testimony was consistent with his fifth grade interviews does not diminish the relevance of the evidence of his potential bias. Second, at the time E. was called into the principal's office, E. did not want to return to Mexico. He may not have known he would be placed with Diane specifically, but he may have known he could be removed from his family if he reported abuse. Thus, the jury might have inferred E. had a motive to lie at that time. Furthermore, the speculation about what E. might have known in the fifth grade goes to the weight of the evidence of E.'s potential bias at the time of trial, not its relevance. (*People v. Clark* (2011) 52 Cal.4th 856, 923 [weight of evidence is not a factor in determining its relevance for admissibility].)

As to the evidence of whether E.'s lies to Diane were so extensive that they caused her to question her decision to adopt him, the Attorney General concedes that the court improperly ruled the testimony would have been improper opinion evidence. (§ 800 [lay witness may give opinion rationally based on witness's perception and helpful to understanding witness's testimony].) But the Attorney General argues the evidence would have been "completely irrelevant to a determination of [E.'s] character and credibility." Again, the evidence that E. persistently lied would have been relevant to his credibility.

The court also grounded its ruling on section 352. The Attorney General argues the court's ruling was correct under that statute because, otherwise, the prosecutor would have been forced to respond by asking Diane what other factors, if any, she considered in deciding whether to adopt E., which would have taken too much time and

17

might have confused the jury. Not so. The issue was a limited one, i.e., whether E.'s lack of honesty caused Diane to reconsider her decision to adopt him. No other aspect of her adoption decision was implicated.

The court abused its discretion by excluding relevant evidence. And, under the unique circumstances of this case and in view of the cumulative effect of these erroneous evidentiary rulings that curtailed defendant's ability to impeach E., the court violated defendant's constitutional rights to present a defense and to cross-examine witnesses. (See *People v. Herring* (1993) 20 Cal.App.4th 1066, 1077 [judgment reversed due to cumulative effect of prosecutor's improper remarks that "went to the heart of the defense [when the] issue was one of credibility"])

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) Although a state's evidentiary rules generally do not abridge an accused's right to present a defense (*U.S. v. Scheffer* (1998) 523 U.S. 303, 308; *People v. Cunningham* (2001) 25 Cal.4th 926, 998), here the court abused its discretion by improperly excluding relevant evidence. Furthermore, a defendant's right to present a complete defense is so elemental that section 352 "must yield to a defendant's due process right to a fair trial and to the right to present all relevant evidence of *significant* probative value to his or her defense." (*Cunningham*, at p. 999.) This is not a case where the court merely excluded defense evidence on a minor or subsidiary point. (*People v. Thornton* (2007) 41 Cal.4th 391, 443.) Rather, the court excluded defense evidence on the ultimate issue in contention. Nor was the proffered evidence cumulative, speculative, irrelevant, and/or hearsay. (*Cunningham*, at p. 994-999) [court did not abuse discretion by precluding defense counsel from, during their examination of witnesses, impugning credibility of chief prosecution witness, because the proffered evidence was cumulative,

18

speculative, irrelevant, and/or hearsay]; see also *People v. Mincey* (1992) 2 Cal.4th 408, 442 [the right to a defense does not include the right to present to the jury a speculative, factually unfounded inference].)

In addition to the right to present a defense, the "'right of confrontation and cross-examination is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal. Indeed, . . . to deprive an accused of the right to cross-examine the witnesses against him is a denial of the Fourteenth Amendment's guarantee of due process of law.'" (*Alvarado v. Superior Court* (2000) 23 Cal.4th 1121, 1137.) "'Within the confines of the confrontation clause, the trial court retains wide latitude in restricting cross-examination that is repetitive, prejudicial, confusing of the issues, or of marginal relevance.'" (*People v. Chatman* (2006) 38 Cal.4th 344, 372.) "'[U]nless the defendant can show that the prohibited cross-examination would have produced "a significantly different impression of [the witnesses'] credibility" [citation], the trial court's exercise of its discretion in this regard does not violate the Sixth Amendment.'" (*Ibid.*)

Defendant has made a sufficient showing that the excluded evidence would have produced a significantly different impression of E.'s credibility. As stated by defendant: "With the trial court's precision carving of the evidence of [E.'s] lack of honesty, the jury was left with a school boy who lies about grades, homework and whether he is out playing with friends; in other words, a typical kid." "Add to that a new adoptive mother who loves her new son and the picture is complete — but of course inaccurate." "What [the jury] did not get to hear is that his lying and sneakiness is so bad that his adoptive mother had questioned her decision to adopt him; that he has an extensive history of conduct including lying about killing animals and stealing money; that he lies about his own Mexican heritage by insisting that he is from Italy." Trial on a sex crime "often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations." (*People v. Falsetta* (1999) 21 Cal.4th 903,

19

915.)  Just as the jury should be apprised of any propensity evidence on the defendant's part, so too should it be informed of evidence relevant to the accuser's credibility.  The court's errors were not harmless beyond a reasonable doubt.  (*Chapman v. California*, *supra*, 386 U.S. at p. 24.)


DISPOSITION


The judgment is reversed.


IKOLA, J.

WE CONCUR:


O'LEARY, P. J.


THOMPSON, J.